UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL L. MCLEAN,

                Plaintiff,          CIVIL ACTION NO. 12-cv-10923

      vs.

                             DISTRICT JUDGE BERNARD A. FRIEDMAN

COMMISSIONER OF           MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Donald Daniel McLean seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment or Remand (docket no. 19) and Defendant's Motion for Summary Judgment (docket no. 26). The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 5.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

I.      **RECOMMENDATION:**

This Court recommends that Plaintiff's Motion for Summary Judgment or Remand (docket no. 19) be DENIED and that Defendant's Motion for Summary Judgment (docket no. 26) be GRANTED.

II.     **PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits with a protective filing date of September 28, 2009, alleging that he had been disabled since June 15, 2008, due to various mental and physical impairments. (TR 10.) The Social Security Administration denied benefits. (TR 10.) Plaintiff requested a *de novo* hearing, which was held on October 1, 2010, before Administrative Law Judge (ALJ) Lloyd Blair, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the national economy. (TR 18-19.) The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced the instant action for judicial review. Plaintiff filed his Motion for Summary Judgment or Remand, and Defendant filed his Motion for Summary Judgment.

## III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was 46 years old at the time of the administrative hearing and 43 years old at the time of alleged onset. (*See* TR 28.) Plaintiff has past work experience as a tool and die finisher; he worked in that position for 23 years. (TR 29, 43.) Plaintiff testified that he hasn't worked since June 15, 2008, due to depression, anxiety, and a bad back. (TR 30, 31.) Plaintiff also indicated that the condition keeping him from working a "real simple job" where he could "sit when [he] wanted to, stand when [he] wanted to[,] . . . [and not] lift more than a couple of pounds" was his depression, anxiety, and decreased ability to comprehend. (TR 43.) Plaintiff testified that he has a twelfth-grade education. (TR 29.) At the time of the hearing, he did not drink alcohol or smoke, but he acknowledged that he was a member of AA, that he attended meetings five days a week (sometimes two times a day), and that he had a relapse in June 2010. (TR 34-35.) Plaintiff testified that he is widowed, and he lives in a home with his two children, who were 13- and 15-years-old at the time

of the hearing.  (TR 35.)  Plaintiff indicated that he does not cook (because he is a bad cook), but he does do laundry, although he has his sons carry the laundry and fold it.  (TR 35-36, 43.)  Plaintiff testified that he shops for groceries and cuts his grass with a lawn mower, but he does not attend his sons' school activities, and he does not do any gardening.  (TR 36-37.)  Plaintiff further testified that he drives his children to school every day.  (TR 39.)  Plaintiff also indicated that he has been very active in AA since May 2007 and that "[they] have camping trips."  (TR 41.)

Plaintiff testified that he started having back problems approximately 10 years before his hearing.  (TR 31.)  He indicated that the pain is generally below his belt line, and it moves down his leg.  (TR 32.)  Plaintiff testified that his pain is about a 6 on a scale of 1 to 10 when he is on medication.  (TR 32-33.)  He told the ALJ that he could not climb stairs and that he could sometimes bend over and sometimes squat.  (TR 37.)  He indicated that he could lift, at most, one to five pounds.  (TR 37.)  Plaintiff testified that he could stand for 15 to 30 minutes and that he could sit for an hour or two with the use of a heating pad.  (TR 37-38.)  Plaintiff testified that he has not had surgery on his back, but he has had approximately five shots for his pain.  (TR 31-32.)  He takes Norco 10-325 for his pain (the only side effect noted by Plaintiff was dry mouth), and he sometimes lays on his back to try to relieve the pain.  (TR 32, 33.)  Plaintiff testified that he has not had physical therapy for his back, but his representative indicated that he did have physical therapy in November or December of 2008.  (TR 31, 38.)

With regard to his mental impairments, Plaintiff indicated that he began treating with a psychiatrist two or three years before the hearing and that he sees her once a month.  (TR 33.)  Plaintiff testified that he is on six medications and that they sometimes make him light-headed when he gets up.  (TR 34.)  Plaintiff told the ALJ that his depression causes him to break down crying and that he doesn't want to leave his house.  (TR 42.)  He indicated that he does go to AA meetings on

3

a regular basis, but most of the time, he just sits and listens. (TR 42.) Plaintiff also testified that he

has a hard time focusing and concentrating. (TR 43.) He stated that he used to deal with blueprints

and measuring devices, but now he can't concentrate enough to perform his job-related tasks. (TR

44.) He testified that he can't read blueprints or micrometers and that he doesn't touch his old tools

because they bring back memories of what he can't do. (TR 44.) Plaintiff testified that this problem

started after his time in rehabilitation for alcohol abuse, sometime around May 2007. (TR 45.)

Plaintiff noted that he worked with this problem for about 13 months before he finally stopped

working in June 2008. (TR 45.)

### B.    Medical Record

Plaintiff's Brief in support of his Motion sets forth his medical history clearly and

completely. (*See* docket no. 19 at 6-11.) Defendant does not discuss Plaintiff's medical record in

detail, but his Brief in support of his Motion does not appear to contradict the record as set forth in

Plaintiff's account. (*See* docket no. 26 at 6-7.) Thus, the Court will adopt Plaintiff's description of

his medical history and will supplement the record where necessary throughout its discussion:

> Plaintiff has a history of lower back and leg pain, anxiety, and depression.
> Plaintiff first sought treatment for lower back and leg pain in 2004. From February
> 23, 2004 to March 16, 2004, Plaintiff regularly attended physical therapy at
> Alternative Rehab for low back pain and thoracic or lumbosacral neuritis or
> radiculitis. (R. 226). During that time, Plaintiff stated that pain and stiffness limited
> him from functional activities such as playing with his children, bending forward,
> sitting, standing, or walking. *Id*. He also reported being unable to lift or clean due to
> pain. *Id*.

> Plaintiff returned to Alternative Rehab for physical therapy between February
> and March 2006. On February 17, 2006, Plaintiff presented for evaluation and
> treatment of lumbar pain. (R. 221). He was diagnosed with lower back pain. *Id*.
> Plaintiff reported difficulty straightening his back and "quite a bit" of mid back pain.
> (R. 222). Plaintiff was not able to tolerate sitting, standing, or walking for more than
> thirty minutes. *Id*. On March 23, 2006, Plaintiff returned to therapy for continuing
> back pain. (R. 224). Plaintiff was discharged from therapy on March 23, 2006. (R.
> 204).

4

From May 16 to May 23, 2007, Plaintiff was admitted at Maplegrove for drug and alcohol abuse. (R. 163). Plaintiff was diagnosed with chemical dependency, alcohol withdrawal syndrome, possible psoriasis, depression, and anxiety. *Id*. Plaintiff's medications included Celexa, Seroquel, and Neurontin. *Id*.

On June 5, 2007, Plaintiff complained of not sleeping well and missing work. (R. 180). On November 20, 2007, Plaintiff complained of episodes of stress, anxiety, and anger; he was prescribed Zyprexa and instructed to return in two weeks. (R. 178). On December 17, 2007, Plaintiff was prescribed Neurontin. *Id*.

On April 21, 2008, a lumbar spine x-ray revealed extremely minimal narrowing of the posterior aspect of the disc space between L5-S1 and spinal bifida occulta involving S1. (R. 264). A November 25, 2008 x-ray of the lumbar spine revealed very minimal narrowing of the disc space between L5-S1 and no significant degenerative changes. (R. 263).

On November 17, 2008, Plaintiff was evaluated at Alternative Rehab for low back pain radiating into his buttock. (R. 217). On December 23, 2008, Plaintiff returned to therapy where he reported constant, aching pain with increasing intensity and an inability to stand for any length of time. *Id*. Plaintiff rated his pain at a level of 6 out of 10. *Id*.

In February 2009, Plaintiff began treatment at Hegira-Westland Counseling Center ("Hegira"). (R. 279). On February 23, 2009, Plaintiff underwent a Biopsychosocial Assessment and Preliminary Treatment Plan ("BAPTP"). (R. 373-387). His symptoms included anger, aggression, poor impulse control, depression, anxiety, mood swings, confused thinking, low memory, helplessness, hopelessness, and self-esteem. (R. 373). Plaintiff admitted to past substance abuse including alcohol and drugs; however, he is currently in remission. (R. 380-81). The evaluating therapist described Plaintiff's general appearance as disheveled with body odor and his affect as agitated, depressed, and anxious. (R. 382). Plaintiff's immediate, recent, and remote memory were reported as impaired, his concentration was listed as impaired, and he was noted to have poor judgment, insight, and impulse control. (R. 383). The therapist checked off boxed to indicate problems with Plaintiff's sleep, hygiene, exercise, nutrition, leisure, and the quality of his social skills—which were noted as isolating. (R. 385). Plaintiff was diagnosed with major depressive disorder (recurrent) and degenerative disc disease. (R. 386). Recommendations included group therapy, individual therapy, and medication. *Id*. Following his evaluation, Plaintiff was admitted into the psychiatric therapy program at Hegira; he was seen on a monthly basis until January 2010. (R. 337-39; 341; 345-51; 353; 355-60; 368; 371-72). During that time, Plaintiff continually struggled with insomnia, anxiety, mood swings, depression, anger, and decreased memory. *Id*. His medications included Trazodone, Klonopin, Cymbalta, Lamictal, Risperdal, and BuSpar. *Id*. On April 23, 2009, Dr. Sunil Koneru, from Hegira, completed a Psychiatric Evaluation. (R. 361-67). Dr. Koneru noted that Plaintiff's impairments resulted in a moderate

impact on overall functioning. (R. 363). He described Plaintiff's psychomotor activity as slow, his affect as tearful and constricted, and his impulse control as impaired. (R. 363-66).

He diagnosed major depression. (R. 367). Between April and August 2010, Plaintiff was routinely treated at Hegira. (R. 409-12).

Between April 2009 and September 2010 Plaintiff was routinely treated by Dr. Norman Treer. (R. 415-21). He prescribed Norco for Plaintiff's pain. *Id*.

On July 29, 2009, Dr. James M. Briesmeister completed a psychological report. (R. 281- 285). Dr. Briesmeister opined that Plaintiff is intellectually functioning within the low extremes of low average with learning deficits in reading, spelling, and math comprehension. (R. 282). He stated that Plaintiff needed a "routine, undemanding, and low stress job" because of psychological stressors. (R. 282). He further reported that Plaintiff's hand-eye coordination and spatial relations skills were within the low extremes of the borderline range and his manual dexterity and motor speed were very weak. *Id*. Dr. Briesmeister opined that Plaintiff's prognosis "depend[ed] on continued therapy to address and control the bi-polar depression as well as ongoing sobriety." (R. 285).

On January 7, 2010, DDS-selected psychiatrist, Leonard Lachover, M.D., completed a consultative exam ("CE"). (R. 294-96). He diagnosed recurrent major depression with psychotic features and a GAF score of 40. (R. 296). Dr. Lachover noted that Plaintiff's self-esteem was low, that his mood was primarily depressed, and that Plaintiff felt uncomfortable in crowds. (R. 294-95). Dr. Lachover opined that the pressures in Plaintiff's work situation could exacerbate his symptoms and cause further deterioration in his condition. (R. 295).

On January 23, 2010, State agency reviewer, Thomas T.L. Tsai, M.D., completed a Mental Residual Functional Capacity ("RFC") questionnaire checking off boxes to indicate Plaintiff to be moderately limited in: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. (R. 297-298). Dr. Tsai then . . . concluded that Plaintiff is capable of unskilled work. (R.299). He stated that Plaintiff is able to "understand, carry out, and remember simple instructions; . . . respond appropriately to supervision, coworkers and work situations; and deal with most changes in a routine work settings. There are no problems with attention and there is sufficient concentration to perform simple 1-2 tasks all on a routine and regular basis." *Id*. Dr. Tsai also completed a Psychiatric Review Technique Form ("PRTF"). (R. 301-11). He found Plaintiff to have affective disorder, anxiety-related disorder, depressive disorder, and substance abuse disorder

resulting in mild restrictions in activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence and pace. *Id*.

On February 12, 2010, a DDS-selected physiatrist, Elizabeth W. Edmond, M.D., completed a consultative exam. (R. 317-21). Dr. Edmond noted that Plaintiff had a flat affect with very little facial expression. (R. 316). She documented that he was slow arising, was limited in tandem walking, and had decreased range of motion with pain in the right shoulder. *Id*. Dr. Edmond opined that Plaintiff might require an ambulatory aid for slopes, uneven ground, or prolonged walking. (R. 317).

On February 23, 2010, non-examining State agency "single decisionmaker" Allan Coggins completed a Physical RFC. (R. 322-29). He reported the following limitations based on degenerative disc disease: occasional lifting of twenty pounds and frequent lifting of ten pounds; standing, walking, or sitting about six hours in an eight-hour workday; unlimited pushing or pulling; occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps or stairs; and no climbing ladders/ropes/scaffolds. (R. 323-24). He . . . concluded that Plaintiff was only partially credible. (R. 327). . . . . Mr. Coggins completed the RFC without the assistance of a medical consultant. (R. 329).

(Docket no. 19 at 6-11 (footnotes omitted).)

## C.   The Vocational Expert

The VE testified that Plaintiff had past work experience as a die finisher, which he classified as skilled, very heavy work as performed by Plaintiff.  (TR 48.)  The ALJ asked the VE to consider an individual who (1) was of the same age, education, and past work experience as Plaintiff; (2) was limited to light work; (3) should never use ladders, scaffolds, or ropes; (4) should only occasionally use ramps, stairs, stoop, kneel, crouch, crawl, or balance; (5) should avoid walking on uneven surfaces; (6) should be limited to only simple, unskilled work, with an SVP of 1 or 2; (6) should be limited to work involving one, two, or three-step instructions; (7) could not perform jobs involving concentration on detailed or precision tasks, multitasking, reading, computing, calculating, problem-solving, or reasoning; (8) required daily instructions from a supervisor; (9) could only perform work involving minimum contact and directions; and (10) could only perform work that does not require changes in work settings or adaptations in work settings more than once per month.  (TR 48.)

The VE testified that such a person could not perform Plaintiff's past relevant work but that there were jobs in Southeastern Michigan for such an individual. (TR 49.) Specifically, the VE testified that there are approximately 5,000 jobs available "involving . . . simple packaging, [and] visual inspection work . . . at the light exertional level." (TR 49.) The VE testified that his testimony was consistent with the Dictionary of Occupational Titles (DOT) and that he relied on additional evidence, including his knowledge of the labor market, in reaching his conclusions. (TR 49-50.) The VE then stated that if the ALJ accepted all of Plaintiff's allegations as true, he would be precluded from performing any jobs in the national economy. (TR 50.)

Plaintiff's representative then asked the VE whether someone with a fifth-grade math education could perform Plaintiff's past relevant work. (TR 50). The VE testified that he "wouldn't rule it out" because he has "seen all kinds of things." (TR 51.) He did, however, note that if the work involved difficult calculations, like compound radii, then a fifth-grade math education would be insufficient. (TR 51.)

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through December 31, 2013; had not engaged in substantial gainful activity since June 15, 2008; and suffered from severe degenerative disc disease and affective disorder; he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 12-14.) The ALJ found that Plaintiff's allegations regarding the extent of his symptoms were not totally credible (TR 16-17) and, thus, found that Plaintiff could perform a significant number of jobs in the national economy. (TR 18-19.) Therefore, he was not suffering from a disability under the Social Security Act at any time from June 15, 2008, through the date of the ALJ's decision. (TR 19.)

## V.    LAW AND ANALYSIS

8

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.   Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     Plaintiff was not presently engaged in substantial gainful employment; and

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.     Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the

pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of

the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where

there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a

sentence-four remand for further consideration."  *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at

*8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).   Plaintiff argues that Defendant's

decision should reversed or remanded under sentence four for the following reasons: (1) the ALJ

failed to properly evaluate Plaintiff's credibility; (2) the ALJ did not afford proper weight to the

medical opinions of record, including Plaintiff's GAF score;[1] (3) the ALJ erred when he arbitrarily

determined Plaintiff's physical RFC; and (4) the ALJ's step-five determination was improper

because the VE did not provide DOT numbers or disclose whether his testimony conflicted with the

DOT.[2]  (*See* docket no. 19.)

### 1.    Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight

and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor

and credibility."  *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997).   But Credibility

assessments are not insulated from judicial review.   Despite the deference that is due, such a

determination must nevertheless be supported by substantial evidence.  *Id.*  An ALJ's credibility

---

[1]Plaintiff also raises the GAF-score argument when challenging the ALJ's determination of his mental RFC.  (*See* docket no. 19 at 22-23.)

[2] Plaintiff also asserts that the ALJ erred when determining Plaintiff's mental RFC. Plaintiff argues that in forming the mental RFC, the ALJ relied on his own lay opinion and rejected findings favorable to Plaintiff, specifically Dr. Lachover's findings.  (Docket no. 19 at 21-22.)  As indicated herein, the Court finds that the ALJ did not err when he afforded less weight to Dr. Lachover's opinion than he did to the opinions of Drs. Briemeister and Tsai.  *See* section V.C.2.c, *infra*.  Thus, the ALJ did not err when he did not include all of Dr. Lachover's limitations in Plaintiff's RFC.

11

determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Plaintiff argues that the ALJ erred in assessing his credibility regarding his physical impairments because (1) the ALJ improperly held Plaintiff's conservative course of treatment against him, (2) the ALJ did not properly account for Plaintiff's subjective complaints of pain, and (3) the ALJ overstated Plaintiff's involvement in taking care of his children.  (Docket no. 19 at 9-12.)  Further, Plaintiff argues that the ALJ erred in assessing his credibility with regard to his mental

12

limitations by "impermissibly nitpick[ing] the record looking for statements that supported a finding of not disabled rather than appreciating the totally (sic) of Plaintiff's medical condition." (*Id.* at 13-14.) With regard to Plaintiff's physical limitations, Defendant argues that the ALJ's credibility finding was free from error because he considered Plaintiff's course of treatment and his involvement in taking care of his children only as part of his overall determination. (*See* docket no. 26 at 17-19.) As Plaintiff notes, Defendant does not directly address Plaintiff's allegation that the ALJ failed to acknowledge his subjective complaints. (Docket no. 29 at 3.) With regard to his mental limitations, Defendant asserts that the ALJ did not "nitpick," he "weigh[ed] the evidence," and that Plaintiff engages in the same nitpicking when citing evidence contrary to the ALJ's determination. (Docket no. 26 at 12 (citing *White v. Comm'r*, 572 F.3d 272, 284 (6th Cir. 2009)).)

In discussing Plaintiff's RFC and his credibility, the ALJ first addressed Plaintiff's subjective complaints:

> The claimant alleges he is unable to work due to constant back pain that occasionally moves into his left leg. The claimant indicated he has experience back pain for the last ten years. He testified he received epidural shots in his back, but they did not help significantly. The claimant indicated lying down provides some relief. He currently takes Norco 10/325 to manage his pain. At the hearing, the claimant testified his pain was a "6" on a scale from "1" to "10", with the use of medication.
>
> Psychologically, the claimant testified that anxiety and depression preclude him from working on a regular and continuing basis. The claimant testified he is unable to focus and concentrate on reading blueprints, which are required in his trade. The claimant said his memory declined, and he did not remember attending physical therapy for his back, despite exhibited medical records. He alleges he also suffers from crying spells and does not want to leave his house. The claimant stated that he does not keep up with housework, and his children help him with chores. The claimant has a history of alcohol abuse. He became sober in 2007 and suffered one relapse that lasted two days. The claimant testified that he started receiving psychiatric treatment through Hegira Counseling Services about two or three years ago. He continues to treat on a monthly basis.

(TR 15.) The ALJ then discussed the objective medical evidence in the record, noting both positive

13

and negative reports regarding Plaintiff's physical and mental impairments.  (TR 15-16.)

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent that they are inconsistent with the [RFC]." (TR 16-17.)  He stated that (1) Plaintiff's medications have "been relatively effective in controlling his symptoms," (2) Plaintiff's [p]hysical therapy records also suggest [Plaintiff's] 'good rehabilitation potential with attainable functional improvement,'" and (3) Plaintiff's treatment was "essentially routine and conservative" because Plaintiff had treated with only pain medication and "a couple of epidural injections."  (TR 17.)  The ALJ also noted that although Plaintiff testified that surgery was discussed, the medical record contained no discussion of surgery.  (TR 17.)  The ALJ also found that Plaintiff's psychotropic medications had been effective in improving his mental health.  (TR 17.)  Finally, the ALJ addressed Plaintiff's ability to care for his children:

> Additionally, the claimant is able to adequately care for his children.  Although his children are not particularly young, ages 13 and 15, the ability to care for them alone can still be quite demanding both physically and emotionally.  The claimant wakes up at 5:30 a.m. to drive his children to school on a daily basis, demonstrating his ability to maintain a schedule.

(TR 17.)

With regard to his physical limitations, the Court agrees with Defendant. The ALJ did consider Plaintiff's course of treatment and his ability to care for his children as part of his credibility determination, but that is precisely what the ALJ is supposed to do when determining a claimant's credibility.  There is nothing to suggest that the ALJ found Plaintiff's conservative course of treatment or his ability to care for his children dispositive of Plaintiff's credibility.  To the contrary, it appears that the ALJ specifically considered (1) the claimant's daily activities (his ability to care for his children and handle household chores), (2) the location, duration, frequency, and intensity of claimant's pain (based on Plaintiff's own testimony), (3) the type, dosage, effectiveness,

14

and side effects of any medication taken to alleviate pain or other symptoms, (4) treatment, other than medication, for pain relief, (5) any measures used to relieve the pain, and (6) functional limitations and restrictions due to the pain. Indeed, had the ALJ's failed to consider Plaintiff's course of treatment or his daily activities, such an omission may have been error.

The Court also agrees with Defendant with regard go Plaintiff's mental limitations. The ALJ, Plaintiff, and Defendant all engaged in what Plaintiff calls "nitpicking" and what Defendant calls "weighing the evidence." The Court, however, finds that the substantial deference afforded to the ALJ in matters of credibility weighs against Plaintiff in this regard. The ALJ had the opportunity to review the same evidence referred to by the Parties, and thus, the ALJ's determination is supported by the evidence in the record.

The ALJ's decision is sufficiently specific to make clear to Plaintiff and the Court the weight given to Plaintiff's statements and the ALJ's reasons for that weight. The ALJ could reasonably conclude that Plaintiff's subjective complaints regarding the severity of his symptoms and the impact of those symptoms were not entirely credible. The ALJ's determinations regarding Plaintiff's credibility are supported by substantial evidence, and therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.[3]

### 2.      Weight of the Medical Opinions

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). It is equally well settled that the ultimate issue

---

[3]Moreover, the ALJ only found that Plaintiff's statements lack credibility to the extent that they were inconsistent with the ALJ's RFC determination. It appears that the ALJ gave Plaintiff substantial benefit if the doubt in determining his RFC. Plaintiff fails to indicate which subjective complaints the ALJ failed to account for in the RFC.

of disability is reserved to the Commissioner and not the treating or examining physician. *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008). Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should

16

be rejected.  Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Additionally, the Sixth Circuit has upheld the decision of an ALJ to give less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) if the ALJ provides "good reason" for the decision.  *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir.2008).  There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6).  *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)).  Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation."  *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).

Plaintiff asserts that the ALJ erred (1) when he failed to discuss the weight given or to provide good reason for not considering the opinion of Dr. Sunil Konru, Plaintiff's treating psychologist; (2) when he failed to account for Plaintiff's GAF score; and (3) when he provided no explanation for affording "great weight" to the opinions of Drs. Briesmeister and Tsai.  (Docket no. 19 at 18-20.)  Defendant argues that (1) the ALJ may not have specifically addressed the weight given to Dr. Konru's opinions, but the ALJ did discuss his opinions, and he accounted for them in the RFC; (2) the ALJ properly accounted for Plaintiff's GAF score and, even if he didn't, a GAF score is not a medical opinion that must be accounted for; and (3) because Drs. Briemeister and Tsai

17

are not "treating physicians," the ALJ did not have to explain why he afforded their opinions the weight that he chose. (Docket no. 26 at 8-12.)

### a.     Dr. Konru's Opinions

The ALJ discussed Plaintiff's treatment with Dr. Konru; the ALJ noted that Dr. Konru found that "claimant struggles with insomnia, anxiety, mood swings, and depression." (TR 16.) He indicated that Dr. Konru prescribed Trazadone for Plaintiff's sleeping problems and Klonopin and Cymbalta for Plaintiff's depression. (TR 16.) The ALJ also recognized that Dr. Konru's notes found Plaintiff to be "pretty depressed" in 2010 and that Plaintiff was not a danger to himself or others. (TR 16.)

Plaintiff is correct that the ALJ failed to give good reason for the weight he afforded to Dr. Konru's opinions; indeed, the ALJ failed to even discuss Dr. Konru's opinions or the weight afforded to them. Thus, the Court would be inclined to agree with Plaintiff. But as Defendant notes, other than noting that Dr. Konru found Plaintiff's memory and concentration to be impaired and that he lacked poor impulse control, Plaintiff does not explain what opinion of Dr. Konru the ALJ failed to consider. In reviewing the records from Hegira, it appears that most of the records are clinical notes with no conclusions, with the exception of a February 2009 assessment. (*See* TR 336-87.) And it appears that the ALJ did account for the opinions contained in the February 2009 assessment when creating the RFC. (*See* TR 382-87.) Thus, even though the ALJ did not appropriately discuss the weight he afforded to Dr. Konru's opinion, the error is harmless as the ALJ made findings consistent with the opinion. Therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.

### b.     Plaintiff's GAF Score

Plaintiff argues that the ALJ failed to take into account Plaintiff's GAF score of 40 as

assigned by Dr. Lachover and that the ALJ erred when he found that Plaintiff's ability to manage funds was inconsistent with his GAF score. (Docket no. 19 at 19.) Defendant contends that the ALJ "could reasonably conclude that there is tension between such an ability and a GAF score in the 31-40 range." (Docket no. 26 at 9.)

While the ALJ's discussion of Plaintiff's GAF scores was not as in depth as it could have been, his inclusion of the score leaves no doubt that he did consider it. Morevoer, while case law from various districts around the country indicates a signification reliance on GAF scores, the Eastern District of Michigan has not followed that trend. *See Pellow v. Astrue*, No. 09-11587, 2010 WL 1626396, *5 (E.D. Mich. Mar. 31, 2010) (Morgan, M.J.) ("Plaintiff's GAF scores are a relevant part of her mental health history, but the GAF scores are by no means controlling, nor is there any law, regulation, or controlling case law that requires that the scores receive significant weight in the ALJ's evaluation of her residual functional capacity."); *Blavatt v. Comm'r*, No. 10-10930, 2011 WL 836805, *9 (E.D. Mich. Feb 4, 2011) (Randon, M.J.) ("[T]he Sixth Circuit has observed, 'no statutory, regulatory, or other authority requir[es] the ALJ to put stock in a GAF score.'") (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (modification in original); citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.

### c.    Dr. Briesmeister and Dr. Tsai's Opinions

Plaintiff argues that it was error for the ALJ to afford "great weight" to the opinions of Drs. Briemeister and Tsai by only stating that Dr. Briemeister's opinion was consistent with the RFC and that Dr. Tsai was a psychiatrist familiar with the agency's disability determination. (Docket no. 19 at 19-20.) Defendant asserts that with regard to Dr. Briemeister, the ALJ appropriately afforded "great weight" to his opinion because Dr. Briemesiter conducted an extensive battery of tests, and

19

he had more information available to him than Dr. Lachover. (Docket no. 26 at 10.) And with regard to Dr. Tsai, Defendant argues that the ALJ was required to consider his status as a state-agency psychiatrist. (*Id.* at 12.) Additionally, Defendant argues that "[a]t most, the ALJ could have given a more thorough explanation for why he chose to accept the opinions," but he was not required to do so because they are not treating sources. (*Id.* at 12. (citing *Kornecky v. Comm'r*, 167 Fed.Appx. 496, 507 (6th Cir. 2006)).) Like the ALJ in *Kornecky*, the ALJ here "neither misstated nor ignored a treating physician's opinion; he merely failed to explain why he favored several examining physicians' opinions over another's." *Kornecky*, 167 Fed.Appx at 507. Thus, like in *Kornecky*, the ALJ did not commit reversible error, and the Court recommends denying Plaintiff's Motion with regard to this issue.

### 3. Plaintiff's Physical RFC

Plaintiff argues that the ALJ's physical RFC for Plaintiff is "completely and utterly lacking and has no basis in the medical records," that "the ALJ clearly minimized Plaintiff's limitations related to his lower back and legs,"[4] and that "there is no accurate and logical bridge between the evidence and the ALJ's decision." (Docket no. 19 at 20-21.) Plaintiff asserts that the RFC is an arbitrary conclusion and that it was "provided by a DDS decisionmaker without consultation with a medical expert."[5] (*Id.* at 20 (citing TR 341).) Defendant notes that it is the ALJ's role to

---

[4]The Court has addressed Plaintiff's assertion that the ALJ did not accept his subjective complains as a matter of credibility. Having found that the ALJ did not err in finding Plaintiff's statements not wholly credible, the Court also finds that the ALJ did not err when he failed to include in the RFC all of Plaintiff's subjective complaints related to his lower back and legs.

[5]Plaintiff and Defendant each note that the ALJ acknowledged the nature of this opinion and afford it no weight. (*See* TR 17.) Nevertheless, Plaintiff argues, the ALJ found that it was consistent with the RFC. (Docket no. 19 at 21.) As Defendant asserts, however, "Plaintiff provides no reason to doubt the truth of the ALJ's statement" that he gave the opinion no weight. (Docket no. 26 at 16.) The ALJ and the state-agency examiner had access to the same medical

determine an RFC; it is not the role of a physician.  (Docket no. 26 at 14.)

"The ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [his] residual functional capacity." *Webb v. Comm'r*, 368 F.3d, 633 (6th Cir. 2004)).  As indicated herein, in determining Plaintiff's RFC, the ALJ discussed Plaintiff's subjective complaints, he cited to Plaintiff's treatment record, and he discussed Plaintiff's consultative examination, indicating that he gave the examiner's opinion "great weight." (TR 15-16.)  The ALJ considered the effects of Plaintiff's medications and his daily activities.  (TR 17.)  The ALJ then used that evidence to form the RFC.  On review of the record, this appears to be a close case; that is, the Court finds that the ALJ could have "gone either way."  Thus, Defendant's decision must be affirmed, even if the Court would have decided the matter differently, *Kinsella* 708 F.2d at 1059, and even though substantial evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.

### 4.    The ALJ's Step-Five Determination

Plaintiff argues that the ALJ's Step-Five determination was improper because (1) the ALJ failed to consider the combination of physical and mental impairments as aggravated by Plaintiff's obesity,[6] (2) the ALJ did not ask the VE whether his testimony conflicted with the DOT (Dictionary of Occupational Titles), and (3) the ALJ did not required the VE to provide DOT numbers.  (Docket

---

records, and "two independent adjudicators might reasonable conclude that the report supported a finding of the ability to do light work with occasional postural activities."  (*Id.*)  Thus, Plaintiff's argument in this regard has no merit.

[6]Although raised in a different context, because the Court recommends finding that the ALJ did not err in determining Plaintiff's RFC, the Court likewise recommends finding that the ALJ did not err when he presented that RFC to the VE.

no. 19 at 23-24, Docket no. 29 at 7.)  Defendant argues that the ALJ did ask the VE if his testimony conflicted with the DOT and that Plaintiff's representative had an opportunity to question the VE with regard to any conflicts and chose not to do so.  (Docket no. 26 at 19-22.)

SSR 00-4p provides that the adjudicator must resolve a conflict between the DOT and the VE "before relying on the VE . . . evidence."  Contrary to Plaintiff's interpretation, the ALJ asked the VE, "Sir, is your testimony today different from or inconsistent with the Dictionary of Occupational Titles." (TR 49.)  The VE responded, "It's consistent, your honor." (TR 49.) Plaintiff apparently contends that the VE's follow-up testimony that he also "relied upon [his] knowledge of the labor market" in making his determination created a conflict.  (*See* TR 49-50.)  Plaintiff's argument, however, assumes that the VE's knowledge is inconsistent with the DOT.  Plaintiff and his representative had a full opportunity to cross-examine the VE on this issue and could have asked whether such an inconsistency existed.  While it is the ALJ's responsibility to "investigate the facts and develop arguments both for an against granting benefits," *Sims v. Apfel*, 530 U.S. 103, 111 (2000), Plaintiff has provided no reason that the ALJ should have assumed the VE's testimony was inaccurate or untruthful.

Plaintiff is correct that the VE failed to provide the DOT codes associated with the packing and visual-inspecting positions that he listed.  (*See* TR 49.)  And as Plaintiff points out, *most* of the inspector and packaging jobs referred to by the VE are heavy, semi-skilled jobs that require interaction with supervisors and co-workers or require precision, concentration, and meeting quotas, all of which are beyond the limitations provided for in the RFC.  (*See* docket no. 19 at 23-24.)  But "even with the inconsistencies and the failure to provide the DOT codes, the ALJ was within his rights to rely on the VE's testimony because the Social Security regulations do not require the VE to rely on classifications in the DOT." *Wilson v. Comm'r*, No. 10-13828, 2011 WL2607098, *6

(E.D. Mich. July 1, 2011) (Cohn, J.) (citing *Conn v. Sec'y of HHS*, 51 F.3d 607, 610 (6th Cir. 1995).

"Moreover, "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Id.* (quoting *Martin v. Comm'r*, 170 F. App'x 369, 374 (6th Cir. 2006)).  As noted, Plaintiff and his representative had a full and fair opportunity to cross examine the VE, and Plaintiff's representative did so on other issues.  The ALJ did not err by failing to expand on that cross examination.  Therefore, the Court recommends denying Plaintiff's Motion in this regard.

## VI.     CONCLUSION

For the reasons stated herein, Plaintiff's Motion (docket no. 19) should be DENIED, and Defendant's Motion for Summary Judgment (docket no. 26) should be GRANTED.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

23

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 28, 2013          s/ Mona K. Majzoub
                                  MONA K. MAJZOUB
                                  UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 28, 2013          s/ Lisa C. Bartlett
                                  Case Manager

24